NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____
                                 :
Bruce C. Nelson,                 :
                                 :
         Plaintiff,              :        CIVIL NO. 05-3692(NLH)
                                 :
     v.                          :
                                 :           OPINION
                                 :
JO ANNE B. BARNHART,             :
COMMISSIONER OF                  :
SOCIAL SECURITY,                 :
                                 :
         Defendant.              :
_____:
```

APPEARANCES:

Philip Wolf, Esq.
228 Kings Highway East
Haddonfield, NJ 08033
     Attorney for Plaintiff

Christopher J. Christie
United States Attorney
     By:  Jennifer S. Rosa
          Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
     Attorney for Defendant


**HILLMAN**, District Judge:

     This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g), to review the final decision of the Commissioner of the

Social Security Administration, denying the application of the

1

Plaintiff, Bruce C. Nelson, for Disability Insurance Benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act. 42 U.S.C. § 401, et seq. The sole issue this Court must determine is whether the Administrative Law Judge ("ALJ") erred in finding that there was "substantial evidence" that Plaintiff was not disabled during the time period of his insured status (i.e. on or before December 31, 1998).[1] For the reasons stated below, this Court will affirm that decision.

## I. Background

A. Procedural History

Plaintiff filed his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on December 22, 1998, with an alleged disability onset date of September 18, 1995. (R. at 238-40.) Plaintiff alleged a number of impairments including chronic fatigue, colitis, loss of strength, Lymes disease, depression, (R. at 184) and

---

[1] Until one earns 40 quarters of coverage ("QCs"), a person is not permanently insured for disability insurance. If not permanently insured, once an individual stops working, QCs will be periodically reduced until an individual is no longer insured and, hence, no longer eligible for disability benefits. See Social Security Online, http://www.ssa.gov/OACT/ProgData/insured.html (last visited Feb. 6, 2007). In Plaintiff's case, his last regular employment outside the home occurred in 1995. By December 31, 1998, his insured status had expired. Therefore, for DIB to be awarded, the disability onset date must be determined to have arisen on or prior to December 31, 1998.

fibromyalgia[2] (R. at 203).

Plaintiff's application for DIB and SSI was initially denied.  (R. at 184.)  Plaintiff's timely filed Request for Reconsideration was also subsequently denied.  (R. at 191.)  A hearing was requested (R. at 194) and held before an Administrative Law Judge ("ALJ") on June 25, 2001 in Voorhees, New Jersey (R. at 173).  ALJ Mark G. Barrett issued a decision denying benefits on September 18, 2001.  (R. at 173-79.)

Plaintiff filed a request for review of the ALJ's decision to the Appeals Council on September 19, 2001.  (R. at 211.)  The request was granted and the Appeals Council vacated the hearing decision and remanded for further development of Plaintiff's subjective complaints, additional evidence as to mental impairment, clarification of the nature and severity of the impairment, and the use of a vocational expert.  (R. at 181-83.)

ALJ Barrett issued a partially favorable decision in the supplemental hearing finding Plaintiff disabled as of January 24, 2005.  (R. at 12-18.)  ALJ Barrett found that Plaintiff retained the residual functional capacity to perform light work prior to March 6, 2001.  (R. at 12-18.)  Since Plaintiff was last eligible for DIB on December 31, 1998, Plaintiff would only receive SSI payments as of March 6, 2001.  Had ALJ Barrett found Plaintiff

---

[2] "Fibromyalgia" is defined as a "syndrome of chronic pain of musculoskeletal origin but uncertain cause." STEDMAN'S MEDICAL DICTIONARY 671 (27th ed. 2000).

disabled on or prior to December 31, 1998, Plaintiff would have received both DIB and SSI payments.  Plaintiff filed a timely Request for Appeals Council Review (R. at 8) which was denied on May 20, 2005 (R. at 4).  Plaintiff filed the present action with this Court on July 25, 2005, seeking judicial review of the ALJ's decision.

    B. <u>Evidence in the Record</u>

        1. <u>Personal and Work History</u>

Plaintiff was born on January 17, 1955 (R. at 27) and has an associates degree from Valley Forge Military College (R. at 28).  Plaintiff testified that he last had a regular job outside the home in 1995 when his "body let go."  (R. at 30.)  Plaintiff has previously worked as a painter (R. at 32-33) and painting foreman (R. at 30-31).  Plaintiff lives with his girlfriend and her three year-old child who is not biologically related to Plaintiff.  (R. at 27-28.)  Plaintiff testified that he could pick up and carry 25 pounds "maybe only once" (R. at 52) and could climb stairs at a "very slow pace" (R. at 53).  Plaintiff testified that he had not taken any medication nor visited a physician within the past three years.  (R. at 59.)  Plaintiff testified that he was "totally disappointed in the medical community."  (R. at 59.)  Plaintiff stated that he sees a chiropractor "two to four times" per month but has not received any epidural injections, attended a pain management center, or undergone surgery or physical

therapy.  (R. at 62-63.)

Plaintiff testified that it "may take as long as an hour" for him to "start to function" and he spends as much as three hours per day clearing his bowels.  (R. at 65.)  Plaintiff stated that he takes care of six dogs.  (R. at 66.)  Plaintiff also testified that he is a member of a hunting club and went deer hunting for one day in December 2003.  (R. at 67-68.)  Plaintiff also stated that he has friends in Maryland that he has visited "two or three times" in the last year.  (R. at 68-69.)  When questioned whether he has attempted to start a job in the past nine years, Plaintiff responded that he "just can't do it."  (R. at 68.)  Plaintiff also stated that he is able to drive locally.  (R. at 68.)

     2. <u>Medical History</u>

Plaintiff was seen and diagnosed with pneumonia on February 21, 1997, by Dr. Alyn Caulk.  (R. at 335.)  Plaintiff was prescribed Biaxin and Flagyl[3] and told to follow up the next week.  (R. at 335.)  At the follow up appointment on February 26, 1997, Plaintiff stated that he "sweats a lot" and coughed persistently.  (R. at 333.)  Plaintiff's Lyme's Disease test was returned negative and Dr. Caulk noted that Plaintiff looked "much better" than previously, but had "no stamina."  (R. at 333.)

---

[3] Both Biaxin and Flagyl are antibiotics frequently used to treat Lyme's Disease. PHYSICIANS' DESK REFERENCE 402-10 (60th ed. 2006).

Plaintiff was prescribed Phenergan with codeine[4] and referred to a neurologist.  (R. at 333.)

Plaintiff visited Dr. Larry Janoff, a neurologist, on May 8, 1997, and complained of generalized chronic fatigue and "mental lapses" in addition to cramping and numbness in his extremities. (R. at 348.)  Dr. Janoff noted that Plaintiff was "alert and oriented and obviously depressed."  (R. at 348.)  He also noted there were no bruits[5] on his neck and he had full visual fields[6]. (R. at 349.)  He had normal cranial nerves, cerebellar testing[7], stance and gait and "diminished . . . but symmetrical" deep tendon reflexes.  (R. at 349.)  Dr. Janoff requested a reevaluation after blood tests and an MRI; however, he noted that "[i]n summary, nothing focal on the examination is apparent." (R. at 349.)

Dr. Janoff conducted a second examination of Plaintiff on

---

[4] Phenergan is frequently prescribed to treat allergic reactions.  PHYSICIANS' DESK REFERENCE 3438 (60th ed. 2006).

[5] "Bruits" are audible sounds heard through the stethoscope during an examination, possibly indicating blockage.  STEDMAN'S MEDICAL DICTIONARY 253-54 (27th ed. 2000).

[6] Frequently, neurological disorders may impair the visual field.  Having no distortion in one's visual field makes the presence of any such disorder less likely.  STEDMAN'S MEDICAL DICTIONARY 1210 (27th ed. 2000).

[7] The cerebellum plays a role in sensory perception and motor output and lies in the bottom, rear of the brain. STEDMAN'S MEDICAL DICTIONARY 323 (27th ed. 2000).

June 4, 1997.  (R. at 346.)  Plaintiff complained of "night sweats and fatigue" and was "convinced" of his high risk for contracting Lyme's Disease despite negative Lyme titer testing. (R. at 346)  Dr. Janoff also noted that Plaintiff was "quite depressed" and referred Plaintiff to a rheumatologist and suggested psychological testing.  (R. at 346-47.)

Plaintiff visited Dr. Anthony Lionetti, a Lyme's Disease specialist, on June 17, 1997.  (R. at 365.)  Plaintiff reiterated his concerns about his exposure to ticks as he stated he had been bitten a minimum of 250 times over the last ten years.  (R. at 365.)  Plaintiff again complained of chronic fatigue.  (R. at 365.)  Dr. Lionetti recorded that Plaintiff was "alert and oriented," had intact cranial nerves, no focal deficits and an intact cerebella, indicating Plaintiff had no motor or sensory problems.  (R. at 367.)  Plaintiff had an appropriate gait, a nonreactive rapid plasma reagin (RPR) indicating a negative result for syphilis, and an EKG within normal limits.  (R. at 367.)  Dr. Lionetti assessed Lyme's Disease and requested new testing to rule out a new infection.  (R. at 367.)

Dr. Caulk conducted a follow up examination on July 11, 1997. (R. at 330.)  A peripherally inserted central catheter (PICC) line[8] of antibiotics was prescribed to treat the suspected Lyme's

---

[8] A "PICC line" is a method by which antibiotics are administered into the body, frequently near the elbow, to reduce the risk of infection.  See http://www.piccexcellence.com/ (last

Disease.  (R. at 330.)  Plaintiff sought referral to a
rheumatologist and a spect scan to determine if the Plaintiff had
Lyme's Disease while magnetic resonance imaging ("MRI"), EKG,
human immunodeficiency virus ("HIV") and Epstein-Barr virus
("EBV") tests were negative.  (R. at 330-31.)

   The use of a pick line was begun on Plaintiff on July 22,
1997.  (R. at 328.)  Plaintiff's abdomen had no masses and was
tender while his stool tests were negative.  (R. at 328.)
Plaintiff was taking Zithromax and Rocephin[9] to alleviate a
possible unknown bacterial infection.  (R. at 328.)  Plaintiff's
brain spect was administered on August 15, 1997 and the results
were within normal limits.  (R. at 326.)

   Plaintiff visited Dr. Lisa Croft on June 2, 1998.  (R. at
373.)  Plaintiff complained of "fever, chills, night sweats . . .
memory losses, [and] fatigue . . .."  (R. at 373.)  Dr. Croft's
examination stated that Plaintiff was "virile, alert, [and]
oriented."  (R. at 373.)  Dr. Croft ordered another Lyme titer
and a chest x-ray, prescribed Daypro for Plaintiff's arthralgia[10]

_____

visited Feb. 6, 2007).

   [9] Zithromax and Rocephin are frequently prescribed
antibiotics.  Rocephin is administered by injection, but may be
self-administered at home.  PHYSICIANS' DESK REFERENCE 2564,
2801-04 (60th ed. 2006).

   [10] Arthralgia is pain in a joint, especially one not of an
inflammatory character.  STEDMAN'S MEDICAL DICTIONARY 149 (27th
ed. 2000).

and planned to consult with Dr. Leonetti.  (R. at 373.)

Dr. Croft saw Plaintiff again on June 4, 1998, where Plaintiff complained of nasal congestion, fever, chills and chest pain.  (R. at 368.)  Plaintiff was "otherwise unremarkable."  (R. at 368.)  Plaintiff was given Claritin D for rhinitis (i.e. nasal inflammation and congestion) and Zocor for excess lipids in his blood and was to follow up with a pulmonologist.  (R. at 368.)

Dr. John Bermingham, a pulmonologist, saw Plaintiff on July 2, 1998, at which time Dr. Bermingham noted the history of Lyme Disease and perfuse sweating.  (R. at 383.)  Plaintiff followed up on July 21, 1998, where Dr. Bermingham noted that Plaintiff was doing "dramatically well" regarding his allergic rhinitis. (R. at 380.)  He also stated that Plaintiff's use of marijuana "may be exacerbating his underlying problems."  (R. at 380.)

Plaintiff visited with Dr. Croft on August 6, 1998, where she again noted the examination was "unremarkable."  (R. at 329.) Plaintiff had ceased taking his lipid medication of his own volition and complained of profuse sweating.  (R. at 329.)  Dr. Croft recommended Plaintiff see a Lyme Disease specialist.  (R. at 329.)

Plaintiff visited Dr. Elizabeth Helfer, an endocrinologist, on September 3, 1998, at which Plaintiff gave a "rather confused history."  (R. at 370.)  Dr. Helfer noted that Plaintiff was

taking Zithromax and acidophilus[11].  (R. at 371.)  Plaintiff reiterated his wheezing and coughing and stated he had no chest discomfort, but that he felt "weak and tired all over."  (R. at 371.)  Dr. Helfer assessed hyperhidrosis[12] and recommended hormone testing and possibly a dermatologic exam.  (R. at 372.)

Dr. Bermingham prepared a medical source statement on February 25, 1999, where he stated that Plaintiff should be able to do work "that requires sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling." (R. at 387.)  He also stated that Plaintiff's pulmonary disease "should not effect his mental activities."  (R. at 387.) Plaintiff had not visited the clinic since July 21, 1998.  (R. at 387.)

Dr. Barry Geller saw Plaintiff on May 3, 1999, during which time Plaintiff complained of short-term memory loss, disorientation, and profuse sweating.  (R. at 389.)  Dr. Geller noted that Plaintiff appeared depressed, but made good eye contact and had "fluent, coherent, and logical" speech.  (R. at 390.)  His memory was "intact three out of three immediately" and "two out of three times after five minutes."  (R. at 390.)  Dr.

---

[11] Acidophilus is a bacteria that helps maintain the digestive system, frequently found in yogurt.  See http://www.webmd.com/hw/diet_and_nutrition/tp21170.asp (last visited Feb. 6, 2007).

[12] Hyperhidrosis is excessive or profuse sweating. STEDMAN'S MEDICAL DICTIONARY 850 (27th ed. 2000).

Geller's assessment was one of adjustment disorder with depressed mood.  (R. at 391.)

A state agency psychologist[13], Amy Brams, completed a psychiatric review technique form on May 30, 2000, that found Plaintiff's impairment, an affective disorder, to be "not severe."  (R. at 392.)  Plaintiff was found to have a moderate restriction on his daily living activities and slight difficulty in maintaining social functioning.  (R. at 399.)  Plaintiff's impairment failed to meet the severity of any of the Social Security Agency's Listed Impairments.  (R. at 399.)

Dr. Lionetti of the Lyme's Disease Treatment Center prescribed Plaintiff Flagyl and Neurontin, a nerve-pain medication, on June 10, 1999.  (R. at 362-64.)  Upon revisiting with Dr. Lionetti on October 7, 1999, Plaintiff was diagnosed with Lyme's Disease and chronic fatigue and was given Zithromax, an antibiotic, and Robitussin.  (R. at 361.)

Plaintiff saw Dr. Sneh Jain on June 20, 1999, where Dr. Jain stated that Plaintiff was "alert and oriented" and his "memory

---

[13] The New Jersey Disability Determination Service (DDS), a division of the Department of Labor and Workforce Development fully funded by the Federal Government, develops medical evidence and makes an initial determination regarding whether a Social Security disability applicant who resides in New Jersey is disabled.  Two-person teams consisting of one physician or psychologist and a disability adjudicator make the determination and subsequently file their report with the Social Security Administration.  See http://www.state.nj.us/labor/dds/ ddsindex.html (last visited Feb. 6, 2007).

was good, speech was normal." (R. at 402.)  His gait and station were normal, there was no lymphadenopathy[14] and his thyroid was not enlarged. (R. at 402.)  Plaintiff had no sensory defects and his bowel sounds were good. (R. at 402.)  Plaintiff had good grip and full movement of all the joints without pain. (R. at 402.)  Dr. Jain assessed histories of Lyme's Disease, chronic fatigue syndrome, colitis, and allergies. (R. at 403.)

Plaintiff was examined by Dr. Levin on February 29, 2000, complaining of decreased stamina. (R. at 355.)  Testing for Lyme's Disease was noted as negative and Plaintiff was diagnosed with possible Lyme's Disease, chronic diarrhea, depression and possible demyelination.[15] (R. at 355.)  All of Plaintiff's stool tests were negative. (R. at 356-58.)

Plaintiff had an MRI administered on April 3, 2000, which warranted further study of the surrounding blood vessels. (R. at 353.)  Dr. Rothman suggested a magnetic resonance angiography ("MRA") be given. (R. at 353.)  A "mild, degenerative spinal

---

[14] Lymphadenopathy is any disease affecting a lymph node. STEDMAN'S MEDICAL DICTIONARY 1038-39 (27th ed. 2000).

[15] Demyelination is a condition affecting the speed at which nerves process signals. When myelin is lost, the processing slows. Demyelination is the primary cause of the symptoms associated with multiple sclerosis. STEDMAN'S MEDICAL DICTIONARY 472 (27th ed. 2000).

stenosis"[16] also appeared.  (R. at 353.)  An April 4, 2000, an MRI of Plaintiff's spine showed an old fracture that minorly displaced the cord posteriorly.  (R. at 352.)  There was no evidence of disc protrusion, disc extrusion or free fragments and no evidence of signal intensity or pathology.  (R. at 352.)

On April 11, 2000, Dr. M.C. Carta-Mangione examined Plaintiff and found "probable fibromyalgia, chronic fatigue syndrome and depression."  (R. at 417.)  Dr. Carta-Mangione found his Lyme's Disease diagnosis "questionable."  (R. at 417.)  Plaintiff was "awake and alert, obviously anxious and depressed with pressured speech and pre-occupation with his somatic symptoms."  (R. at 417.)  Plaintiff's muscle strength and coordination were normal along with an unremarkable sensory examination.  (R. at 417.)  Plaintiff did have "severe hyperpathia"[17] in both upper and lower extremities.  (R. at 417.)  Dr. Carta-Mangione suggested a follow-up with an MRA to rule out the presence of a small intercranial aneurysm.  (R. at 417.)

Dr. Richard Hymowitz, a rheumatologist, examined Plaintiff on May 2, 2000 for chronic pain and fatigue.  (R. at 418-19.)  Dr.

---

[16] Spinal stenosis is a narrowing of the spine that frequently occurs in middle-aged individuals that can cause lower-back and leg pain.  STEDMAN'S MEDICAL DICTIONARY 1695 (27th ed. 2000).

[17] Hyperpathia is an exaggerated subjective response to pain with a continuing sensation after the stimulation has ceased. STEDMAN'S MEDICAL DICTIONARY 853 (27th ed. 2000).

Hymowitz noted Plaintiff's use of I.V. Rocephin and Claforan, both antiobiotics, for two months in 1997 and that Plaintiff had not worked in five years.  (R. at 418.)  He noted "scattered tender points" and "full range of motion of all joints" and that neurologically "he appears grossly intact."  (R. at 418.)  He stated his impression that Plaintiff's chronic pain was "consistent with fibromyaglia" and that he was depressed.  (R. at 418.)  Dr. Hymowitz later made a statement to the state disability determination service on May 2, 2000, in which he noted that Plaintiff had "no obvious motor, reflex or sensory deficits other than those associated with chronic pain."  (R. at 445.)  Plaintiff had a normal gait, no obvious aphasia,[18] and his "cognitive, behavioral and psychological manifestations are a reflection of chronic pain and depression."  (R. at 445.)

Dr. John W. Peterson, an infectious disease specialist, examined Plaintiff on May 16, 2000, and stated that he was a "diaphoretic male with generally unremarkable findings."[19]  (R. at 430.)  He stated that Plaintiff appeared "clearly debilitated" due to an "as yet undiagnosed illness."  (R. at 430.)  Dr. Peterson's June 20, 2000 follow up noted that an "extensive

---

[18] Aphasia is an impairment of comprehension or speech due to an acquired lesion of the dominant cerebral hemisphere. STEDMAN'S MEDICAL DICTIONARY 110 (27th ed. 2000).

[19] A diaphoretic individual is one with increased perspiration.  STEDMAN'S MEDICAL DICTIONARY 493 (27th ed. 2000).

serologic work-up for infectious disease" had "diffusely
negative" results, including a negative Lyme test.  (R. at 428.)
On the date of the follow up, Dr. Peterson noted "some asymmetric
blushing" and "muscle fasciculations" of the upper extremities.
(R. at 428.)  Dr. Peterson's impression was that Plaintiff had a
"protracted illness with diaphoresis, weight loss, arthralgia and
elevated CPK of unclear etiology."  (R. at 428.)  A CT of his
chest, abdomen and pelvis were all normal.  (R. at 427.)

Dr. Peterson wrote to Dr. Levin, Plaintiff's primary care
physician, on June 27, 2000 noting that a CAT scan, MRA and past
neurologic evaluations had been unremarkable.  (R. at 423.)  Dr.
Peterson recommended a tertiary care center evaluation to
determine the cause of Plaintiff's diaphoresis, loss of dexterity
and cognitive decline.  (R. at 423.)  Dr. Peterson's "disability
statement" requested that Plaintiff remain out of work until the
completion of his consultation at a tertiary care center and that
Dr. Peterson was concerned with his "progressive clinical
decline."  (R. at 426.)

Dr. Gluckman of the University of Pennsylvania Health System
examined Plaintiff on March 6, 2001, and noted that he doubted
that Plaintiff ever had Lyme's Disease.  (R. at 448-50.)  Dr.
Gluckman diagnosed Plaintiff with a "severe somatoform

15

disorder"[20] and chronic fatigue syndrome/fibromyalgia.  (R. at

450.)  Dr. Gluckman noted that Plaintiff's "prognosis is

terrible" and recommended cognitive therapy and "aggressive"

treatment for depression.  (R. at 450.)

## II. Discussion

In his January 24, 2005 decision, ALJ Barrett found that

there was substantial evidence that Plaintiff was not disabled

prior to December 31, 1998.  In the ALJ's view, Plaintiff failed

to demonstrate that he was disabled during his insured time

period, which ended on December 31, 1998.  Plaintiff has appealed

this decision.

A.   Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial

review of the Commissioner's decision to deny a complainant's

application for Disability Insurance Benefits.  Ventura v.

Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must

uphold the Commissioner's factual decisions where they are

supported by "substantial evidence."  42 U.S.C. §§ 405(g),

1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir.

2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams

---

[20] A "somatoform disorder" is defined as one of "a group of
disorders in which physical symptoms suggest physical disorders
for which there are no demonstrable organic findings or known
physiologic mechanisms, and for which there is . . . a strong
presumption that the symptoms are linked to psychological factors
. . .."  STEDMAN'S MEDICAL DICTIONARY 528 (27th ed. 2000).

16

v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  Similarly, an ALJ must also consider and weigh all of the non-medical

17

evidence before him.  Id. (citing Van Horn v. Schweiker, 717 F.2d
871, 873 (3d Cir. 1983)); Cotter v. Harris, 642 F.2d 700, 707 (3d
Cir. 1981).

The Third Circuit has held that access to the Commissioner's
reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all
> evidence and has sufficiently explained the
> weight he has given to obviously probative
> exhibits, to say that his decision is
> supported by substantial evidence approaches
> an abdication of the court's duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  Although an
ALJ, as the fact finder, must consider and evaluate the medical
evidence presented, Fargnoli, 247 F.3d at 42, "[t]here is no
requirement that the ALJ discuss in its opinion every tidbit of
evidence included in the record," Hur v. Barnhart, 94 Fed. Appx.
130, 133 (3d Cir. 2004).  In terms of judicial review, a district
court is not "empowered to weigh the evidence or substitute its
conclusions for those of the fact-finder."  Williams, 970 F.2d at
1182.

Moreover, apart from the substantial evidence inquiry, a
reviewing court is entitled to satisfy itself that the
Commissioner arrived at his decision by application of the proper
legal standards.  Sykes, 228 F.3d at 262; Friedberg v. Schweiker,
721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp.
791, 793 (D.N.J. 1981).

18

B.   <u>Standard for Disability Insurance Benefits</u>

The Social Security Act defines "disability" for purposes of an entitlement to a period of disability and disability insurance benefits as the inability to engage in any substantial gainful activity by reason of any medically determinable physical and/or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  <u>See</u> 42 U.S.C. §1382c(a)(3)(A).  Under this definition, a plaintiff qualifies as disabled only if his physical or mental impairments are of such severity that he is not only unable to perform his past relevant work, but cannot, given his age, education, and work experience, engage in any other type of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  42 U.S.C. § 1382c(a)(3)(B)(emphasis added).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential analysis.  <u>See</u> 20 C.F.R. § 404.1520.  This five-step process is summarized as follows:

1.   If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2.   If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3.    If the severe impairment meets or equals a listed
      impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1
      <u>and</u> has lasted or is expected to last for a continuous
      period of at least twelve months, the claimant will be
      found "disabled."

4.    If the claimant can still perform work he has done in
      the past ("past relevant work") despite the severe
      impairment, he will be found "not disabled."

5.    Finally, the Commissioner will consider the claimant's
      ability to perform work ("residual functional
      capacity"), age, education, and past work experience to
      determine whether or not he is capable of performing
      other work which exists in the national economy.  If he
      is incapable, he will be found "disabled."  If he is
      capable, he will be found "not disabled."

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is

therefore dependent upon a finding that the claimant is incapable

of performing work in the national economy.

   This five-step process involves a shifting burden of proof.

<u>See</u> <u>Wallace v. Secretary of Health & Human Servs.</u>, 722 F.2d 1150,

1153 (3d Cir. 1983).  In the first four steps of the analysis,

the burden is on the claimant to prove every element of his claim

by a preponderance of the evidence.  <u>See</u> <u>id</u>.  In the final step,

the Commissioner bears the burden of proving that work is

available for the plaintiff: "Once a claimant has proved that he

is unable to perform his former job, the burden shifts to the

Commissioner to prove that there is some other kind of

substantial gainful employment he is able to perform."  <u>Kangas v.</u>

<u>Bowen</u>, 823 F.2d 775, 777 (3d Cir. 1987); <u>see</u> <u>Olsen v. Schweiker</u>,

703 F.2d 751, 753 (3d Cir. 1983).

Upon remand from the Appeals Council, ALJ Barrett issued a partially favorable opinion.  ALJ Barrett found that Plaintiff retained the residual functional capacity to perform light work prior to March 6, 2001; however, the ALJ determined that Plaintiff was disabled as of that date.

C.   Plaintiff's Arguments

Plaintiff argues that the Commissioner's decision denying him benefits was incorrectly decided because the ALJ erred in determining that there was "substantial evidence" that Plaintiff was not disabled during the time period of his insured status, on or before December 31, 1998.  Specifically, Plaintiff argues that (I) the ALJ failed to develop the record in compliance with the Appeals Council remand order regarding the assessment of his disabling symptoms and evaluating his credibility, and that (ii) the ALJ failed to consider the impact of his financial status on his ability to obtain medical treatment.  For the following reasons, this Court will affirm the decision of the ALJ and Plaintiff's application will be denied.

1.   **Whether the ALJ properly complied with the Appeals Council order to further assess Plaintiff's allegations of disabling symptoms and evaluate his credibility**

Plaintiff argues that the ALJ improperly ignored evidence of Plaintiff's medical conditions, specifically Dr. Janoff's May 1997 report and reports by Dr. Croft and Dr. Helfer, in making the disability determination.  (Pl. Br. at 8.)  The Commissioner

21

counters that the symptoms these physicians documented were
complaints of pain made by Plaintiff that were not supported by
the diagnostic findings of the physicians themselves.   The
Commissioner further counters that the ALJ did not find Plaintiff
to be entirely credible.   It is questionable whether this court's
review should be circumscribed or significantly affected, as
Plaintiff contends, by the Appeals Council's guidance to the ALJ
upon remand; nevertheless, this court reviews the entirety of the
ALJ's reasoning in determining whether or not it is supported by
substantial evidence.

   An ALJ must give "serious consideration to the plaintiff's
subjective complaints of pain, even when those assertions are not
fully confirmed by objective medical evidence." LaCorte v.
Bowen, 678 F. Supp. 80, 83 (D.N.J. 1988) (citing Welsch v.
Heckler, 808 F.2d 264, 270 (3d Cir. 1986)). However, it is well
within the ALJ's discretion "to evaluate the credibility of a
claimant and to arrive at an independent judgment in light of
medical findings and other evidence regarding the true extent of
the pain alleged by the claimant." Brown v. Schweiker, 562 F.
Supp. 284, 287 (E.D. Pa. 1983) (quoting Bolton v. Secretary of
HHS, 504 F. Supp. 288 (E.D.N.Y. 1980)).   Subjective complaints of
pain "do not in themselves constitute disability." Green v.
Schweiker, 749 F.2d 1066, 1070 (3d Cir. 1984).   Furthermore,
despite the presence of conflicting medical evidence, the ALJ may

properly weigh the medical assessments and resolve the
inconsistencies.  LaCorte, 678 F. Supp. at 84 (citing Richardson
v. Perales, 402 U.S. 389, 399 (1971)).  This Court must consider
whether substantial evidence supports Plaintiff's subjective
complaints of pain; however, the question is not one of whether
or not a preponderance of the evidence favors the ALJ's decision.
If substantial evidence supports the ALJ's factual findings, they
cannot be disregarded by this Court.  Dumas v. Schweiker, 712
F.2d 1545, 1553 (2d Cir. 1983).

It is true, as Plaintiff notes, that an "ALJ must review all
pertinent medical evidence and explain his conciliations and
rejections."  Burnett, 220 F.3d at 122.  However, an ALJ is not
obligated to explicitly address every piece of relevant evidence
considered in making a decision.  See Fargnoli, 247 F.3d at 42.
In contrast to Plaintiff's contention that the ALJ did not
consider Dr. Janoff's report, the ALJ's opinion on January 24,
2005 did reference the evaluation by Dr. Janoff twice, once in
citing Dr. Cohen's reference to Plaintiff's medical history and
again in finding the existence of functional capacity prior to
March 6, 2001.[21]  (R. at 15.)  The ALJ did not "discount" the

_____

[21] Plaintiff contends in his reply brief that Defendant's
reference to certain information in Dr. Janoff's January 24, 2005
opinion was ignored by the ALJ.  Plaintiff is correct in stating
that the Commissioner may not substitute his own analysis in
place of the ALJ's.  If the ALJ fails to conduct a thorough
analysis, the Commissioner may not remedy the omission.  However,
even discounting the reference by the Commissioner to Dr.

"pertinent evidence" of other medical opinions, specifically Dr. Janoff's; rather, he referenced these evaluations as evidence of functional capacity and as support for Dr. Cohen's conclusion that they failed to assist in an "accurate diagnosis" of Plaintiff's condition as of 1999.  (R. at 15.) Because the ALJ agreed with Dr. Cohen's assessment of the inability to form a conclusive medical diagnosis as of 1999 due to "insufficient evidence," (id.) a more specific treatment of Dr. Janoff's evaluation by the ALJ would not have been helpful.  (R. at 15.)

The ALJ also specifically addressed the findings of Dr. Jain, the state agency consulting physician, whose findings did not indicate any significant abnormalities and failed to substantiate the subjective complaints made by Plaintiff.  (R. at 402.)  Dr. Jain found that Plaintiff had normal gait and station, normal lung sounds, good bowel sounds, full, painless movement in all joints, and no redness or swelling in them.  (R. at 402.)  In short, Dr. Jain's evaluation contained nothing tending to support the conclusion that Plaintiff was disabled prior to March 6, 2001.  Dr. Bermingham's opinions noted a similar absence of

_____

Janoff's findings that Plaintiff contends are "beyond the scope" of the ALJ's opinion and, therefore, cannot be considered by this Court, (Pl. Re. Br. at 2-3), it does not necessarily follow that the ALJ did not consider this entire medical evaluation.  The lack of a more specific reference to the details of Dr. Janoff's medical conclusion merely indicates that the ALJ did not find them "particularly notable."  Barnhart, 94 Fed. Appx. at 133 (3d Cir. 2004) (citing Fargnoli, 247 F.3d at 42).

negative medical conclusions and, furthermore, stated that the Plaintiff would not have, from a pulmonary standpoint, any limitations on his mental or physical activities or ability to work. (R. at 387.) Even an examination by Dr. Peterson as late as May 16, 2000, was inconclusive. (R. at 426.) Therefore, Plaintiff's claims that light work could not be performed prior to March 6, 2001, are contradicted by the medical conclusions of a number of physicians. (R. at 16.) As such, the ALJ was within his discretion to substantially discount the veracity of Plaintiff's subjective complaints of pain and their effect upon Plaintiff's inability to perform work.

Cases where ALJ decisions have been criticized for failing to analyze all of the evidence in the record, including Cotter and Fargnoli, invariably focus upon the "medical findings or opinions" of physicians, Cotter, 642 F.2d at 704, and "clinical findings," Farnoli, 247 F.23d at 43, as opposed to a Plaintiff's subjective complaints. Here, Plaintiff's complaints to Dr. Janoff, Dr. Croft, and Dr. Helfer are not supported by similar medical conclusions from those physicians. As the Commissioner correctly noted, the findings of these physicians are generally "inconclusive" or "unremarkable." (R. at 346-49, 370-74.)

The ALJ's treatment of these particular medical reports was also influenced by the ALJ's evaluation of Plaintiff's questionable credibility, which seriously undermined their

evidentiary value as it rests almost exclusively upon the
subjective complaints of Plaintiff contained in them and not upon
the medical opinions or conclusions of the physicians.  The ALJ
specifically referenced Plaintiff's testimony that he was a
professional guide in the woods, hunted, and bred dogs.  (R. at
15.)  This testimony, coupled with Plaintiff's sporadic medical
treatment and refusal of pain medication (R. at 59-60), placed
his subjective complaints, as documented in various medical
evaluations, in serious doubt.  This testimony by Plaintiff
should not be disregarded merely because it conflicts with other
evidence proffered by him.  (Pl. Re. Br. at 3.)

    In light of this, the ALJ properly afforded less evidentiary
value to the reports of Dr. Janoff, Dr. Croft, and Dr. Helfer.
It was not until Dr. Gluckman's prognosis on March 6, 2001, that
a "severe somatoform disorder" was diagnosed.  (R. at 450.)  Dr.
Gluckman noted that Plaintiff's medical condition was "terrible"
and required further cognitive therapy.  Id.  Dr. Gluckman's
evaluation was not simply one of greater "precision" than that of
previous physicians; his conclusions were qualitatively
different.  (Pl. Br. at 10.)  No previous physician had described
Plaintiff's prognosis as "terrible" or necessitating "aggressive"
treatment.  (R. at 450.)

    One of the central functions of comparing a claimant's
condition to a specified section of the Listings is not simply to

identify that a claimant has a particular ailment, but whether the *severity* of that ailment rises to the level required to qualify for benefits.  Claimants do not become entitled to DIB backdated to the Listed ailment's roughly estimated date of inception upon a finding of disability qualification; rather, the requisite intensity of the ailment is a condition precedent to the receipt of benefits.  In light of Dr. Gluckman's conclusions, the ALJ determined that substantial evidence indicated Plaintiff's medical condition had markedly deteriorated by March 6, 2001.  As such, this Court finds that Plaintiff's medical history, when viewed in its totality and considering the impact of Plaintiff's credibility, provides substantial evidence in support of the ALJ's determination.

        **2.   Whether the ALJ failed to consider Plaintiff's financial status and its impact on Plaintiff's lack of medical insurance and sporadic treatment**

        Plaintiff argues that ALJ Barrett improperly discounted Plaintiff's lack of funds and medical insurance in stating that Plaintiff had "not generally received the type of medical treatment that one would expect for a totally disabled individual." (R. at 14.)  Plaintiff is correct that an ALJ may "not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the record,

that may explain infrequent or irregular medical visits or failure to seek medical treatment." See Newell v. Commissioner of Social Security, 347 F.3d 541, 547 (3d Cir. 2003) (citing SSR 96-7p).  As SSR 96-7p provides, the ALJ is required to make a finding regarding the "credibility of the individual's statements about the symptom(s) and its functional effects."  SSR 96-7P, 1996 WL 374186 (S.S.A.).

In Newell, the court found that a plaintiff's inability to afford treatment and a lack of medical insurance were adequate explanations for the absence of medical treatment.  Newell, 347 F.3d at 547.  In this case, however, Plaintiff testified that he "choose [sic] not to take any medication because that's just the way I am." (R. at 59.)  Plaintiff also stated that he had not visited a physician in years because he was "totally disappointed in the medical community, number one." (R. at 59.)  In light of Plaintiff's testimony, the ALJ did not draw a negative inference regarding Plaintiff's lack of medical treatment without considering the possibility of a financial explanation.  Rather, the ALJ was within his discretion to conclude that the evidence, specifically Plaintiff's testimony given after the Appeals Council remand order, indicated Plaintiff's failure to seek medical treatment was unreasonable and not due solely to a lack of financial means.  This Court finds that the ALJ, having had the benefit of first-hand observation, and having carefully

28

considered the evidence, did not exceed the bounds of his discretion in evaluating Plaintiff's credibility.  As such, the ALJ's conclusions with regard to Plaintiff's credibility are supported by substantial evidence.

**III.   <u>CONCLUSION</u>**

For the reasons stated above, the Commissioner's finding will be affirmed.  The accompanying Order is entered.


DATE: March 16, 2007          s/ Noel L. Hillman

At Camden, New Jersey         NOEL L. HILLMAN

                              United States District Judge